# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HEATHERTON MELINDA FAVAZZA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-17-CJB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |
| | ) |

---

Gary Linarducci, LINARDUCCI & BUTLER, PA, New Castle, Delaware; Karl E. Osterhout, OSTERHOUT BERGER DISABILITY LAW, Oakmont, PA, Attorneys for Plaintiff.

David C. Weiss, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware; Brian C. O'Donnell, Regional Counsel, Annie Kernicky, Assistant Regional Counsel, Margaret W. Reed, Special Assistant United States Attorney, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

---

## __MEMORANDUM OPINION__

April 24, 2023
Wilmington, Delaware

---

[1]   Kilolo Kijakazi was sworn in as the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted for Andrew Saul, Commissioner of Social Security who was originally named as the defendant in this suit.

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

Plaintiff Heatherton Melinda Favazza ("Favazza" or "Plaintiff") appeals from a decision of Defendant Kilolo Kijakazi, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 401-33. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Favazza and the Commissioner (the "motions"). (D.I. 12; D.I. 14) Favazza asks the Court to reverse the Commissioner's decision and remand this matter to the Commissioner for a rehearing. (D.I. 13 at 20) The Commissioner opposes that request and asks that the Court affirm her decision. (D.I. 14 at 1; D.I. 15 at 2) For the reasons set forth below, Favazza's motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART, the Commissioner's cross-motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART and the case will be REMANDED to the Commissioner for further proceedings consistent with this opinion.

I.    **BACKGROUND**

A.    **Procedural Background**

On July 26, 2018, Favazza filed an application for Title II Social Security benefits; she alleged disability beginning on December 15, 2017. (D.I. 9 (hereinafter "Tr.") at 94-95, 236) Favazza later amended her alleged onset date of disability to July 13, 2018. (*Id.* at 231) Her claim was denied initially and then again upon reconsideration. (*Id.* at 94, 101) Favazza then filed a request for an administrative hearing. (*Id.* at 124-25) On March 30, 2020, a hearing was

2

held before an Administrative Law Judge ("ALJ"); during the hearing, Favazza was represented by counsel. (*Id.* at 41-93)

On May 12, 2020, the ALJ issued a decision denying Favazza's request for disability benefits. (*Id*. at 10-27) Favazza requested review of the ALJ's decision by the Appeals Council, and the Appeals Council ultimately denied Favazza's appeal. (*Id.* at 1-3) Thus, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955 & 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On January 8, 2021, Favazza filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 2) On August 9, 2021, Favazza filed her motion for summary judgment. (D.I. 12) The Commissioner opposed Favazza's motion and filed a cross-motion for summary judgment on September 8, 2021. (D.I. 14) On March 30, 2022, the parties consented to the Court's jurisdiction to conduct all proceedings in this action, including entry of a final judgment. (D.I. 20)

### B.    Factual Background

At the time of the alleged onset of her disability on July 13, 2018, Favazza was 42 years old; at the time of the ALJ's decision in May 2020, she was 44. (Tr. at 194) Favazza is a high school graduate and, as will be further discussed below, has past work experience as an orthodontic technician, medical receptionist, and dental assistant. (*Id.* at 26, 256)

### 1.    Plaintiff's Medical History, Treatment, and Condition

Favazza alleges that she suffers from a number of relevant physical conditions, including fibromyalgia, lumbar herniated disc, cervicalgia, tarsal tunnel, and migraines. (*Id.* at 240) She also states that she suffers from many relevant mental health conditions, including anxiety,

depression, and hypersomnia chronic fatigue.  (*Id.*)  Below, the Court sets out some relevant evidence of record regarding these conditions and related conditions.

### a.  Physical Medical History

Beginning around January 2017, Favazza reported feeling chronic pain in her joints, including her hands, ankles, feet, and knees.  (*Id.* at 370)  She sought treatment from her primary care provider, Dr. Jane Moore, throughout early-to-mid-2017; during those visits, Favazza noted that her pain was not improving, and in fact was getting worse.  (*See id.* at 469, 476, 493, 510, 554)

In July 2017, Favazza was diagnosed with fibromyalgia by treating providers at Christiana Care Rheumatology; examination findings from that visit included pain with pressure on all joint lines and soft tissue tenderness of her shoulders, elbows, wrists, fingers, hips, knees, and ankles.  (*Id.* at 372-73)  She discussed various medication options and was referred to physical therapy and pain management.  (*Id.* at 373)

Between early 2017 and December 2017, Favazza tried numerous medications and treatments for her chronic pain (including Lyrica, Naproxen, Tylenol 4, Nucynta, Gabapentin, physical therapy, nerve blocks, ablation and epidurals); for various reasons, none of these were successful in alleviating the pain.  (*Id.* at 370, 373, 380, 389, 415, 463, 567, 755, 766, 768, 776) In December 2017, Favazza returned to Dr. Moore, reporting "severe pain all the time[.]"  (*Id.* at 1682)  Dr. Moore noted a "failure of all treatments[,]" in that the prescribed treatments either did not work or they worked to some degree but resulted in "severe side effects" that were "incapacitating[.]"  (*Id.* at 1683)  Dr. Moore referred Favazza to a pain management specialist, Dr. Maryum Rafique.

Favazza began seeing Dr. Rafique around December 2017, (*id.* at 558), and typically saw her about once a month from then until around February 2020, (*id.* at 2186).  Throughout that period, Favazza routinely presented with pain in her shoulders, hands, ankles, low back, and neck, which manifested as numbness, aching, throbbing, tingling, weakness, pins/needles, tenderness, and muscle spasms; Favazza reported that standing, walking, sitting, and driving were all aggravating factors for her pain.  (*See, e.g.*, *id.* at 1184, 1187, 1192, 1197, 1213, 1219, 1222, 1257, 1266, 1478, 1497, 1922, 1928, 1931, 1937, 1944-45, 1951-52, 2081)

In addition to pain caused by fibromyalgia, Favazza also suffers from chronic back pain as a result of a lumbar herniated disc and degenerative disc disease.  A July 2017 MRI of the cervical spine showed multilevel degenerative changes, most prominent at C5-C6; there was also disc osteophyte complex with subtle deformity of the ventral cord without cord signal abnormality, mild canal stenosis, and uncovertebral spurring, which contributed to moderate bilateral neuroforaminal stenosis.  (*Id.* at 847)  Chiropractic treatment notes from October to December 2018 show subluxations at C1, C4, C6, T2, T7, L1, L4, and right pelvis; moderate to severe muscle spasms; and tenderness to palpation of the posterior cervical, upper thoracic, mid thoracic, lower thoracic, lumbar, left anterior thigh, right anterior thigh, left anterior wrist, and right anterior wrist.  (*Id.* at 1594-1608)  An MRI of the lumbar spine on September 13, 2019 showed a new left lateral disc protrusion with annular fissure abutting the exiting left L4 nerve root.  (*Id.* at 1528-29)  An MRI of the cervical spine on October 4, 2019 showed stable multilevel mild degenerative spondylosis, most pronounced at C5-C6 with small disc osteophyte complex causing mild impression of the left ventral thecal sac and stenosis of the neural foramina, but no cord compression.  (*Id.* at 1538-39)  An MRI of the thoracic spine on October

5

11, 2019 showed minimal protrusion of the annulus at the T6-T7 level and at T2-T3, but no associated spinal canal stenosis or cord compression.  (*Id.* at 1540)

### b.      Mental Health-related Medical History

Favazza's records indicate that she has a history of depression and anxiety.  There are references to these conditions dating back to her earliest available medical records from 2017.  (*See, e.g.*, *id.* at 535, 546, 657, 1621)

Beginning in June 2018, Favazza sought treatment from APRN-BC Nicole LaPorte ("LaPorte") due to worsening anxiety and depression.  (*Id.* at 1620-21)  She reported that she felt like "her depression [was] being [a]ffected by her chronic pain and anxiety[,]" and that she "worried [that] she w[ould] not be able to continue doing her job" due to her chronic pain.  (*Id.* at 1621)  Favazza saw LaPorte until around May 2019.  (*Id.* at 1645)  During that time, Favazza reported fluctuations in her conditions.  (*Id.* at 1621 (beginning treatment for worsening anxiety and depression in June 2018); *id.* at 1638 (anxiety disorder was "[s]table at this time with current meds" in November 2018, but reporting worsening depression); *id.* at 1643 (no changes in anxiety as of February 2019, but non-improving depression); *id.* at 1646 (increased anxiety and depression "due to [an] increase in stressors" as of May 2019))

In addition to her work with LaPorte, Favazza also sought treatment from Mid-Atlantic Behavioral Health ("Mid-Atlantic") starting around November 2018; at this point, Favazza was having memory and speech difficulties, including trouble with word-finding and difficulty articulating her thoughts.  (*Id.* at 1403)  In December 2018, she underwent neuropsychological testing.  (*Id.* at 1412-31)  Favazza scored in the average range on the verbal comprehension index and in the borderline range in perceptual reasoning.  (*Id.* at 1416)  Her abilities to sustain attention, concentrate, and exert mental control were identified as a weakness relative to her

6

verbal reasoning abilities.  (*Id.* at 1417)  Her cognitive issues were deemed likely a result of

multifactorial causes, including sleep apnea, fibromyalgia, migraines, chronic pain, depression,

and anxiety.  (*Id.* at 1424)

After her evaluation, Favazza continued treatment with Mid-Atlantic, including with

Jennie Lowe, MSW ("Lowe") and Kristin David, PMHNP ("David").  (*Id.* at 1829-30)

According to her records, Favazza was a patient of Mid-Atlantic until around January 2020.  (*Id.*

at 2171)  Throughout that time period, her depression and anxiety continued to fluctuate, though

in an apparently positive direction.  (*See, e.g.*, *id.* at 2123 (noting "minimal" or "moderate"

progress in "[d]epressed [m]ood" and "[e]xcessive [w]orry/[n]ervousness" in June 2019); *id.* at

2130 ("moderate" progress in July 2019); *id.* at 2138 (same as of August 2019); *id.* at 2173 (as of

January 2020, "attains goal" in "[i]ncrease[d] positive mood" and "[e]xcessive

[w]orry/[n]ervousness"))  She regularly reported having a depressed, anxious, bashful, or tense

mood with a blunted affect, but her cognitive levels were deemed almost entirely normal,

including her judgment, description of her thought processes, her fund of knowledge, her insight,

and her consciousness.  (*See, e.g.*, *id.* at 2110, 2113, 2116, 2119, 2122, 2125-26, 2129, 2133,

2137, 2140-41, 2144, 2148-49, 2152, 2156-57, 2160, 2164-65, 2172)

Favazza also reported changing levels of difficulty with activities of daily living, feeling

tired or without energy, feelings of hopelessness, frequent crying, nervousness, poor motivation,

and hypersomnia; these too appeared to trend in a positive direction.  (*Id.* at 2112, 2115, 2118

(energy, hopelessness, and motivation "worse" in May 2019); *id.* at 2121 (some improvement on

June 17, 2019); *id.* at 2124 ("fluctuating" in June 2019); *id.* at 2128 (some areas "improved[,]"

others "resolved" in July 2019); *id.* at 2132 ("fluctuating" later in July 2019); *id.* at 2136

("improved" or "resolved" on August 16, 2019); *id.* at 2139 ("fluctuating" on August 23, 2019);

*id.* at 2143 (on September 13, 2019, excessive worry and lack of energy were "worse[,]" but motivation, feelings of hopelessness and frequent crying were "resolved"); *id.* at 2147 (September 26, 2019, all "fluctuating"); *id.* at 2151 (some "improved" or "resolved" on October 11, 2019, while others were "unchanged" or "worse"); *id.* at 2155 (either "improved" or "fluctuating" as of October 25, 2019); *id.* at 2159 (all categories "resolved" as of November 8, 2019); *id.* at 2163 (all categories "improved" as of November 22, 2019, except nervousness and excessive worry, which were "fluctuating"); *id.* at 2167 (as of December 6, 2019, all categories "resolved"); *id.* at 2171 (same, as of January 2, 2020))

### c.    Reports from Medical Professionals

A great number of medical professionals have completed relevant medical reports regarding Favazza's conditions.  So as to reduce redundancy, below the Court will simply list the name of the physician and the date of the relevant report.  In Section III, the Court will provide significant detail about the content of these reports and the ALJ's analysis of the reports.

These include the following reports prepared by Favazza's medical providers:

- Dr. Rafique (November 2, 2018)

- LaPorte (November 20, 2018) (hereafter, the "LaPorte opinion")

- Dr. Moore (November 25, 2018)

- Carina Rodriguez, PT ("Rodriguez") (December 12, 2018)[2]

- Dr. Rafique (February 18, 2019)[3]

---

[2]    One of Dr. Rafique's relevant opinions (dated February 18, 2019 and discussed below), (Tr. at 1456), relies on this December 12, 2018 evaluation conducted by Rodriguez.

[3]    The Court will at times refer herein to both of Dr. Rafique's opinions as the "Rafique opinions."

- Dr. Moore (September 20, 2019)

- Dr. Moore (October 29, 2019)[4]

- David and Lowe (January 9, 2020) (hereafter the "David/Lowe opinion")

The Commissioner also had certain medical providers make evaluations of Favazza. Among the relevant evaluations and resulting reports of this type are:

- Dr. Kimberlyn R. Watson (September 27, 2018)

- State Agency Administrative Findings (February 18, 2019)

## 2.    The Administrative Hearing

At the administrative hearing, which was held telephonically on March 30, 2020, the ALJ heard the testimony of Favazza and Vanessa Ennis, an impartial Vocational Expert ("VE"). (*Id.* at 49-84)

### a.    Favazza's Testimony

At the hearing, Favazza first discussed her work history. (*Id.* at 49-54) She explained that most recently she had been working part-time (about 20 hours per week) as a dental assistant for Dr. Mastrota at Great Whites Dental, a job she began in approximately March 2019. (*Id.* at 49, 64, 91) Favazza stated that she had been working in this role up until March 12, 2020, when the COVID-19 pandemic required that the office close. (*Id.* at 49) In this role, Favazza stated that she "assist[ed] the doctor with procedures[.]" (*Id.* at 54)

Before that, Favazza worked as an orthodontic assistant at various practices, including the following: (1) Hendrix Orthodontics from 2016 to 2018, (2) Greeley and Nista Orthodontics

---

[4]    Herein, the Court will refer to all three of the opinions from Dr. Moore as the "Moore opinions."

from 2012 to 2015, and (3) Alpine and Rafetto Orthodontics from 2005 to 2011.  (*Id.* at 50, 91)
Favazza said that she performed the same duties at each practice; these included putting wires in
braces, taking impressions, mixing the alginate for impressions, pouring out models, taking care
of sterilization, and cleaning up the office.  (*Id.* at 51)  Prior to these orthodontic assistant
positions, Favazza worked at ENT Allergy of Delaware as a medical receptionist.  (*Id.*)  There
she checked patients in for appointments, took co-pays, verified insurance, made appointments
for patients, and checked them out.  (*Id.* at 53).

   Questioning then turned to Favazza's physical and mental impairments and how they
affected her past jobs.  She testified that she was let go from her position at Hendrix
Orthodontics because she was "having medical problems that interfered with [her] ability to do
the work[,]" predominantly problems with her hands.  (*Id.* at 56)  Her hands "would shake, and
the doctor [she] worked for was afraid [she] was going to drop instruments on the patients."  (*Id.*)
She also no longer had the strength to put wires in patients' braces, and she was unable to mix
the alginate for impressions due to her hands.  (*Id.*)  Favazza also suffered from fatigue, and
during lunch, she would have to take a nap in her car due to her exhaustion.  (*Id.* at 56-57)
Favazza also testified that her memory was not as good as it used to be, as she found herself
forgetting how to do medical procedures that she had performed many times before.  (*Id.* at 56)

   Favazza stated that she has also struggled with lower lumbar and neck pain for a while;
she has not obtained any sort of permanent relief despite having undergone various treatments.
(*Id.* at 57, 59)  That pain was exacerbated by sitting, in that sitting puts pressure on her sciatic
nerve, and because looking down at patients while sitting causes her neck to hurt.  (*Id.* at 58)
Favazza said she has problems stretching and lifting, particularly with her right shoulder.  (*Id.* at
59)

Favazza then went on to discuss the problems she was facing in her current job.  (*Id.* at 64)  She said "[t]he main problem is just sitting[, ] especially if it's a longer procedure[.]"  (*Id.*)  Favazza specified that her problem with sitting is that she experiences pain in her neck and back.  (*Id.* at 64-65)  Favazza also testified that she has problems with her hands and wrists.  (*Id.* at 66)  Her hands are often swollen, and she can have a hard time putting gloves on without experiencing pain.  (*Id.*)  She has trouble having to suction for a long time due to "carpal tunnel" in her wrists, and she also has trouble keeping her arms outstretched, particularly with respect to her right dominant arm.  (*Id.* at 67)  Favazza testified that the ability to use both hands is important to her role as an orthodontic assistant.  (*See id.* at 59)  Specifically, she explained that her hands are generally "overstretched out to the patient's head" because "[o]ne hand is using air[ or the] water syringe, and the other hand is using the suction."  (*Id.*)  It is also difficult to mix alginates to take impressions, in light of the pain in her hands.  (*Id.* at 67)

Additionally, Favazza testified that her mental health issues, including anxiety and depression, "sometimes" make it difficult for her to concentrate at her current job.  (*Id.* at 70)  She stated that her fibromyalgia results in "brain fog" and that she does not think as clearly as she used to before her diagnosis.  (*Id.* at 65, 70)  She explained that this causes problems for her at work if, for example, the doctor tells her a particular tooth number and procedure that is needed and she does not remember it or "get[s] it backwards."  (*Id.* at 70-71)  When asked whether her anxiety and depression were under control, Favazza said "not completely" and stated that she was still working on it with her therapist.  (*Id.* at 72)

Favazza said she did not think she could work 40 hours a week due to the pain in her hands and exhaustion she feels after working part-time.  (*Id.* at 71)

       **b.**      **Vocational Expert's Testimony**

11

VE Ennis also testified during the hearing.  She explained that Favazza's three prior orthodontic technician positions were considered to be skilled work; these jobs are typically performed at the sedentary level of exertion and are listed as Specific Vocational Preparation ("SVP") Level 6 positions.  (*Id.* at 77)  As for Favazza's prior work as a medical receptionist, this is a semi-skilled position; such jobs are typically performed at the sedentary level, at an SVP Level 4.  (*Id.* at 77-78)  Finally, Favazza's then-current position was as a dental assistant; this is a skilled position with a light exertional level (although according to Favazza, she performed the position at a sedentary level).  (*Id.* at 78)  The position is an SVP Level 6.  (*Id.*)

Next, the ALJ posed a first hypothetical:

> [A]ssume an individual of the claimant's age, education, and experience.  If such an individual *is able to perform sedentary work*, only occasionally climb ramps and stairs, and never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch, never crawl, is able to tolerate no more than occasional exposure to extreme heat, extreme cold, humidity, wetness, fumes, odors, dusts, gases, poor ventilation, vibrations, and hazards, such as moving machinery or unprotected heights, if the individual is able to tolerate lights no brighter than a typical office setting level, and noise no louder than a typical office setting level, and *is able to finger, handle, and reach no more than frequently*, can perform no more than simple[,] routine[,] repetitive tasks and cannot work at a production pace, such as assembly line work, would such an individual be able to perform the claimant's past work?

(*Id.* (emphasis added))  The VE considered these limitations and noted that such an individual would not be able to perform Favazza's past work because an individual with mental limitations in a skilled or semi-skilled position would not be able to perform simple, routine, and repetitive tasks.  (*Id.* at 79-80)

The VE then testified, however, that there were other jobs in the national economy that an individual with Favazza's limitations could perform, including:  (1) a "sorter[,]" which is an

unskilled position with a sedentary exertional level, (2) a "table worker[,]" which is an unskilled position with a sedentary exertional level, and (3) an "addresser[,]" which is an unskilled position with a sedentary exertional level.  (*Id.* at 80)

The ALJ then posed two additional hypotheticals.  In the first, the ALJ asked whether:

> If in addition to the limitations I listed in the very first hypothetical, including the limitation to simple, routine, and repetitive task[s] not at a production pace, the individual would also require the opportunity to move from a seated position to a standing position, or vice versa, for up to five minutes every hour, remaining on-task, would that impact your response regarding the jobs you listed?

(*Id.* at 81)  The VE testified that it would not.  (*Id.*)  The ALJ concluded by asking whether "the individual w[as] never able to kneel or crawl[, . . .] would that impact the jobs you've listed?" (*Id.*)  The VE again responded that it would not.  (*Id.*)

Favazza's counsel then questioned the VE.  Counsel first asked whether an individual would be able to do the jobs identified by the VE if the individual was limited to occasional, rather than frequent, use of their hands, arms, and fingers; to that, the VE responded that the person would not "[b]ecause these jobs are at least frequent with the bilateral . . . functioning."[5] (*Id.*)  Additionally, counsel asked whether an individual would be able to maintain employment if they:  (1) "were off-task 20% of the day[;]" (2) "missed more than two days per month[;]" (3) "needed to lie down during the day for an hour[;]" (4) "were unable to work eight hours a day[;]" or (5) "couldn't remember very simple instructions, and they had to have significant additional

---

[5]    In follow up, the ALJ later asked whether "there are any jobs [that the VE was] aware of that would meet [the first] hypothetical with occasional [manipulative] limitations" to which the VE responded "[n]o, not performing sedentary [work.]"  (Tr. at 83)

reminders[.]" (*Id.* at 82)  The VE responded to all of these questions by noting that such an individual with such limitations would not be able to maintain competitive employment.  (*Id.*)

### 3.    The ALJ's Findings

On May 12, 2020, the ALJ issued her decision, which included the following 11 findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since July 13, 2018, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia; degenerative disc disease; carpal tunnel syndrome; tarsal tunnel of the right foot; migraines; status-post cervical rhizotomy; trigeminal neuralgia; anxiety; attention deficit hyperactivity disorder (ADHD); and depression (20 CFR 404.150(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, [the ALJ] find[s] that the claimant has *the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)* except, occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds[;] occasionally balance, stoop, kneel, crouch, and crawl, and can tolerate occasional exposure to extreme cold, extreme heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards.  *She can perform frequent fingering, handling, and reaching,* can tolerate lights no brighter than a typical office setting, and can tolerate noise no louder than a typical office settling.  She can perform simple, routine, repetitive tasks, but not at a production pace.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

14

7.  The claimant was born on January 9, 1976 and was 4[2] years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 13, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. at 10-27 (emphasis added))

## II.     STANDARD OF REVIEW

### A.     Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks and citation omitted). In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision to determine whether the correct legal standards were applied. *Bierley v. Barnhart*, 188 F. App'x 117, 119 (3d Cir. 2006). The Court's review of legal issues is plenary. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

## III.   DISCUSSION

In resolving the instant motions, the Court will first address the relevant law regarding the disability determination process. It will then go on to assess Favazza's arguments on appeal.

### A.   Disability Determination Process

Title II of the SSA "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). To qualify for DIB benefits, the claimant must establish that

he or she was disabled prior to the date last insured.  20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).  A "disability" is defined for purposes of DIB as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); *see also Tate v. Berryhill*, C.A. No. 15-604-LPS, 2017 WL 1164525, at *5 (D. Del. Mar. 28, 2017).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. § 423(d)(2)(A); *see also Tate*, 2017 WL 1164525, at *5.

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 C.F.R § 404.1520; *see also Russo v. Astrue*, 421 F. App'x 184, 188 (3d Cir. 2011).  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.  *See* 20 C.F.R. § 404.1520(a)(4).  The Court has set out this five-step process many times in the past, including in *Roberts v. Kijakazi*, Civil Action No. 21-14-CJB, 2022 WL 17403479, at *8 (D. Del. Dec. 2, 2022); it incorporates by reference that discussion here.  As will be discussed below, steps four and five of the five-step process are particularly relevant to this appeal.

At step four, after having determined that a claimant is not currently engaged in substantial gainful activity and is suffering from one or more severe impairments, the Commissioner determines whether the claimant retains the residual functional capacity (or "RFC") to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv) (stating that a

claimant is not disabled if he or she is able to return to past relevant work); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. 20 C.F.R. § 404.1520(a)(4)(v) & (g) (mandating a finding of non-disability when the claimant can adjust to other work and a finding of disability when the claimant cannot do so); *Plummer*, 186 F.3d at 428. At this last step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a VE (as the ALJ did here). *Id.*

In assessing the medical evidence as to steps four and five, the ALJ must also consider the requirements of 20 C.F.R. § 404.1520c ("Section 404.1520c"). That regulation requires the ALJ to consider the persuasiveness of all medical opinions and prior administrative medical findings based on the application of five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or

contradict the opinion.  20 C.F.R. § 404.1520c(c); *Weidner v. Kijakazi*, Civil Action No. 20-1250-MN, 2022 WL 610702, at *11 (D. Del. Feb. 1, 2022), *report and recommendation adopted*, 2022 WL 610678 (D. Del. Feb. 16, 2022).  "The ALJ must explain how [s]he considered the most important factors of supportability and consistency." *Weidner*, 2022 WL 610702, at *11 (citing 20 C.F.R. § 404.1520c(b)(2)).[6]  After doing so, if the ALJ concludes that there are medical opinions or prior administrative findings about the same issue that are equally well-supported but that conflict, then the ALJ should articulate how the other three Section 404.1520c factors impacted her decision about which opinion to credit. *Id*. (citing 20 C.F.R. § 404.1520c(b)(2)-(3))

### B.    Favazza's Arguments on Appeal

On appeal, Favazza presents one overarching argument:  that there is not substantial evidence to support the ALJ's RFC determination at step four, nor the ALJ's related decision at step five that Favazza's impairments did not preclude her from adjusting to certain available work in the national economy.  (D.I. 13 at 11)  Favazza argues that in the RFC assessment process, the ALJ improperly found certain medical opinions to be unpersuasive and failed to provide adequate explanations for why she rejected those opinions.  (*Id.* at 11-13)

Favazza's argument relates to particular medical opinions about her mental health (the LaPorte opinion and David/Lowe opinion) and her physical limitations (the Moore opinions, the

---

[6]      "Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion." *Weidner*, 2022 WL 610702, at *11 (internal quotation marks and citation omitted).

Rafique opinions and Rodriguez's opinion).  The Court will address Favazza's arguments about each of these opinions in turn.

### 1.    LaPorte Opinion

Favazza's first argument is that the ALJ erred in the RFC determination process by wholly failing to mention the LaPorte opinion in her decision.  As a result, Favazza asserts that the ALJ contravened legal authority requiring that she consider each relevant medical opinion of record, articulate how persuasive she found each opinion, and "draw an accurate and logical bridge between the evidence and her conclusion regarding the persuasiveness of th[e] opinion[]." (*Id.* at 15 (citation omitted))  This failure, according to Favazza, necessarily meant that the ALJ's RFC conclusion was not supported by substantial evidence.

It is undisputed that, in her decision, the ALJ did not address the LaPorte opinion.  But the Commissioner argues that the ALJ's failure to do so was harmless, since the LaPorte opinion would not have been persuasive nor changed the outcome of this case.  (D.I. 15 at 8-9); *see Rutherford,* 399 F.3d at 553 ("[R]emand is not required here because it would not affect the outcome of the case."); *Walls v. Berryhill*, C.A. No. 16-245 (MN), 2019 WL 1062493, at *11 (D. Del. Mar. 6, 2019) ("No principle of administrative law or common sense requires us to remand a case in [the] quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)); *Wolfe v. Comm'r of Soc. Sec.*, Civil Action No. 12-6083 (JLL), 2013 WL 5328343, at *10 (D.N.J. Sept. 20, 2013) (reinforcing that "the [United States Court of Appeals for the] Third Circuit has opted not to require remand" in instances where an ALJ's decision that does not consider medical evidence has no effect on the outcome of the case) (citing *Rutherford*, 399 F.3d

20

at 553).  According to the Commissioner, this is because the opinion was not consistent with LaPorte's own treatment records.  (D.I. 15 at 9)[7]  The Court agrees.

In her November 20, 2018 opinion, Laporte concluded that Favazza did not have the ability to perform simple, repetitive work 40 hours per week without missing more than two days of work per month, due to Favazza's major depressive disorder and generalized anxiety disorder. (Tr. at 1519)  LaPorte also stated that Favazza's "co-morbid pain, health[] and mental health is [a]ffecting [her] ability to function daily at this time[.]"  (Id.)  LaPorte additionally opined that Favazza could not remain "on task" at least 80% of the work day because she was "having difficulty with depression and anxiety, which [a]ffects [her] concentration, mood, energy, and motivation."  (Id. at 1520)[8]

However, the objective findings in LaPorte's sparse treatment notes either do not support or directly contradict her conclusions.  This is because LaPorte recorded largely normal findings for Favazza in the months leading up to her opinion.  For instance, on June 20, 2018, roughly five months before LaPorte's opinion, LaPorte met with Favazza, who was then complaining of "worsening anxiety and depression[.]"  (Id. at 1621)  However, upon examination, LaPorte found

---

[7]     Favazza did not file a brief responding to the Commissioner's summary judgment brief.  (D.I. 16)  Thus, as to this issue and the other issues raised by Favazza on appeal, the Court had no written rejoinder from Favazza to consider when making its decision.

[8]     On the Psychological Functional Capacity Form that LaPorte completed, LaPorte was asked to rate Favazza's estimated degree of impairment in different categories, by choosing one of five possible ratings.  Two of those ratings indicate that a person's impairments significantly affect his or her ability to function in the workplace:  a "severe" rating ("extreme impairment of the ability to function") or a "moderate severe" rating ("an impairment which seriously affects ability to function").  (Tr. at 1520-22)  With regard to those categories relating to the competitive labor-market setting, LaPorte listed no "severe" ratings and only one "moderate severe" rating (as to the category of "[c]op[ing] with pressures of ordinary work, i.e., meeting quality and production norms").  (Id.)  In the remainder of the listed categories in that section, LaPorte listed only "moderate" or "mild" ratings.  (Id.)

that Favazza's "[c]oncentration, language, and knowledge are good" and that Favazza was "able to follow the conversation and answer questions directly." (*Id.*) LaPorte also noted that Favazza's insight and judgment were good, that she was dressed appropriately and was well groomed, that she could maintain good eye contact, that her speech rate and tone were within normal limits, that her memory was intact and that her thought process and content were within normal limits. (*Id.*) At LaPorte's next meeting with Favazza on November 6, 2018 (just a few weeks before LaPorte's November 20, 2018 opinion), although Favazza reported that her depression had recently worsened, LaPorte's objective mental status exam demonstrated the same normal findings as were found during the June 20, 2018 visit. (*Id.* at 1638; *see also id.* at 1643 (showing the same results at a later February 1, 2019 evaluation)) And although LaPorte was continuing to tweak Favazza's depression-related medication, LaPorte's objective findings concluded that Favazza's anxiety disorder was "[s]table at this time with current meds[.]" (*Id.* at 1638)

Put together, these objective findings appear to conflict with LaPorte's conclusion that Favazza would be unable to remain "on task" at least 80% of the workday due, in part, to "concentration" difficulties and a lack of an ability to "function daily."[9] And there is simply no

---

[9]     *Cf. Hoyman v. Colvin*, 606 F. App'x 678, 680 (3d Cir. 2015) (finding that a doctor's medical assessment was contradicted by his own treatment notes where, for instance, the medical assessment concluded that the claimant's impairment would "constantly interfere with his powers of attention and concentration and would also preclude him from interacting closely with others," and yet the physician's treatment notes indicated that the claimant "was doing a lot better with his depression in December 2010 and, as of February 2011, was pleasant, very engaging, witty, and looking well") (internal quotations marks and citations omitted); *Rickabaugh v. Berryhill*, 271 F. Supp. 3d 721, 735 (D. Del. 2017) (finding that the ALJ properly afforded a physician's medical opinion limited weight, where the physician's evaluation concluded that the claimant had limited social function, but where relevant treatment notes stated that the claimant's concentration and judgment improved to average when he was on medication, and where the claimant's medical testing scores showed only mild to moderate symptoms).

support in the objective findings for LaPorte's remaining conclusions.[10]  Thus, even if the Court

were to remand based on the ALJ's failure to consider the LaPorte opinion, this would not alter

the ALJ's final decision with respect to Favazza's mental health limitations.[11]  In such a

circumstance, then, remand is not required.  *See Dalpiaz v. Comm'r of Soc. Sec.*, CIVIL NO.

---

[10]    *See Moua v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-01230-BAK, 2022 WL
317189, at *6-8 (E.D. Cal. Feb. 2, 2022) (finding that the ALJ properly rejected a treating
physician's opinion as unpersuasive, in part because the physician's opinion was not supported
by any objective examinations or findings and was contradicted by other record evidence, even
though there was a wealth of subjective reports by the claimant regarding his mental health
limitations).

[11]    The Court pauses here to distinguish the way it has assessed LaPorte's records in
this case from the facts impacting its decision in another recent case:  *Roberts v. Kijakazi*, Civil
Action No. 21-14-CJB, 2022 WL 17403479 (D. Del. Dec. 2, 2022).  In *Roberts*, the Court
concluded that an ALJ's opinion was not supported by substantial evidence and remanded the
case for further proceedings, where the ALJ improperly rejected certain mental-health-related
medical opinion evidence.  *Id.* at *9-12.  In doing so, the Court criticized the ALJ's finding that
because the claimant had exhibited certain positive mental health indications during in-office
therapeutic examinations (e.g., "intact cognitive functioning, cooperative and appropriate
behavior, and [the] ability to abstract and do arithmetic calculations"), this helped to demonstrate
that the claimant could perform her past relevant work.  *Id.* at *10.  The Court explained that the
ALJ's decision in this regard wrongfully failed to account for the fact that the claimant's mental
health limitations were specifically triggered *by being in the workplace*.  *Id.*  In other words, in
that situation, the fact that the claimant exhibited some normal mental health traits *in a medical
provider's office* said little about whether the claimant could function at work—when *actually
being at work* was what caused the claimant to have panic attacks and other mental health
troubles.  *Id*. & n.7.

In assessing the LaPorte opinion above, the Court has admittedly also relied on a
provider's treatment notes related to her in-office visits with the claimant (i.e., on LaPorte's
observations that Favazza had relatively normal findings as to psychological functioning).  But
for at least two reasons, in this case it seems much more appropriate to credit LaPorte's positive
in-office observations about Favazza's mental health status.  First, unlike in *Roberts*, here there
is no indication that Favazza's mental health limitations are specifically triggered by being in the
workplace.  And second, in *Roberts*, while the ALJ focused on the physician's *positive* in-office
observations of the claimant's mental health, the ALJ said little about the many *negative* clinical
mental health observations found in those very same notes.  *Id*. at *11.  In contrast, here
LaPorte's relevant notes contain entirely normal clinical observations.

3:18-CV-1008, 2019 WL 5067454, at *5-6 (M.D. Pa. Oct. 9, 2019) (concluding that the ALJ's failure to explicitly consider the claimant's physician's opinion was harmless error, where the claimant failed to explain how remand for consideration of the opinion would change the outcome, and where the physician's opinion was contradicted by other evidence of record that the ALJ did consider).[12]

### 2. David/Lowe Opinion

Favazza's next argument is that the ALJ erred by failing to provide a reasonable basis for rejecting the David/Lowe opinion. (D.I. 13 at 16)

In that opinion, dated January 9, 2020, David and Lowe concluded that Favazza did not have the ability to perform simple, repetitive work 40 hours per week without missing more than two days per month. (Tr. at 2174) In support of this conclusion, they stated that "[Favazza]

---

[12]        Favazza also argues that even if the ALJ's failure to consider the LaPorte opinion alone is not enough to require remand, then the Court must separately remand, pursuant to 20 C.F.R. § 404.1520c(c)(2), to allow the ALJ to consider the alleged consistency between the LaPorte opinion and David/Lowe opinion. (D.I. 13 at 15-16)

As an initial matter (and as will be discussed further below), there are a number of aspects of LaPorte's opinion that are not in line with parts of the David/Lowe opinion. (*Id*. at 16 (Favazza acknowledging that the opinions are "not in lockstep")) But even if certain aspects of LaPorte's opinion (such as LaPorte's ultimate conclusion that Favazza could not perform simple, repetitive work 40 hours per week without missing more than two days of work per month) are similar to parts of the David/Lowe opinion, this would still not be a basis for remand. That is because while Section 404.1520c(c)(2) states that the more consistent a medical opinion is with the evidence from other sources, the more persuasive it will be, the relevant inquiry about consistency is directed to the "record as a whole, and not just to the narrow universe of medical opinions." *Weidner*, 2022 WL 610702, at *12. And here, where LaPorte's conclusions do not gibe with the objective medical evidence *in her own treatment notes*, they could not be said to be consistent with the record "as a whole." *See id.* (rejecting the claimant's argument that the ALJ wrongly discounted the opinions of two physicians that were consistent with each other, pursuant to Section 404.1520c(c)(2), because those opinions were not actually consistent with the content in the physicians' own treatment notes); *see also Cox v. Soc. Sec. Comm'r*, Case No. 19-13490, 2021 WL 1186500, at *2 (E.D. Mich. Mar. 30, 2021).

24

reports she can only work for a few hours each day and has to l[ie] down mid-day due to pain from fibromyalgia and fatigue caused by depression." (*Id.*)  They also concluded that Favazza was able to remain "on task" at least 80% of the day, meaning she had the "mental ability to focus on the job, and not be distracted or unproductive, due to psychologically[-]based symptoms." (*Id.*)  In support, they noted that "[i]f [Favazza] works only a few hours per day[,] she reports she is able to stay on task." (*Id.*)  David and Lowe further stated that Favazza had no "severe" impairments in the various labor-related categories listed, and only one category in which she had a "moderate severe" impairment:  "[u]nderstand[ing] simple, primarily oral instructions[.]" (*Id.* at 2174-76)  The practitioners further noted that Favazza has "[t]rouble concentrating, racing thoughts, fatigue, irritability, [and] nervousness." (*Id.* at 2175)

The ALJ found that the David/Lowe opinion was not persuasive.  According to the ALJ, this was because the opinion was "not supported by the overall medical evidence or consistent with the record as a whole, and it appears to rest, at least in part, on the claimant's subjective reports of pain and functional limitations, rather than objective findings." (*Id.* at 25)  In the Court's view, the ALJ's decision here is supported by substantial evidence.

In one part of her decision, the ALJ provided a detailed analysis of the treatment records that are most relevant to the David/Lowe opinion.[13]  As the ALJ noted, these records indicate

---

[13]     While this portion of the ALJ's decision does not identify David or Lowe by name, it does specify that the records reviewed were from Mid-Atlantic, which is where David and Lowe treated Favazza.  (Tr. at 23)  Additionally, while the ALJ discussed these Mid-Atlantic records in a different portion of her decision than where she listed her conclusion about the strength of David and Lowe's opinion, (*compare id.* at 23, *with id.* at 25), it is clear that the two discussions are linked.  In other words, even though when the ALJ listed her conclusion about the David/Lowe opinion, she did not then list the facts supporting that decision immediately thereafter, it is obvious that the ALJ's conclusion was drawn in significant part from her analysis of the previously-summarized Mid-Atlantic records.  *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (noting that the

largely normal mental health findings in the year leading up to the David/Lowe opinion,

including as to concentration and fatigue.  Summarized below are some pertinent findings,

including those cited by the ALJ:

- At a January 24, 2019 exam, Favazza was described as depressed with a blunted affect, had spontaneous speech aphasia, paraphasia, and had trouble recalling the events of the 24-48 hours leading up to the appointment.  (*Id.* at 2110)  But Favazza was also recorded as being "awake and alert" with normal levels of orientation, judgment and insight, fund of knowledge, associations, and thought processes, including rate of thought, content of thought, abstract reasoning, and computation.  (*Id.*; *see also id.* at 23)  She was described as being well groomed and "easily responsive to visual, verbal and tactile stimulation[.]"  (*Id.* at 2110)

- At a February 11, 2019 appointment, Favazza was recorded as having an anxious, bashful, tense and unhappy mood and a blunted affect.  (*Id.* at 2113)  But her memory (including recent memory) was intact, she was "awake and alert[,]" she was oriented, had normal judgment and insight (including "fair" judgment concerning everyday activities and "fair" judgment concerning social situations), her language was intact, she had a normal fund of knowledge, unimpaired mental activity and abstract thinking, and normal associations.  (*Id.*; *see also id.* at 23)  She was described as being well groomed and "easily responsive to visual, verbal and tactile stimulation[.]"  (*Id.* at 2112)

- At a June 21, 2019 appointment, Favazza's affect was described as normal and appropriate to the situation.  (*Id.* at 2126)  She was further reported to be "awake and alert" with normal levels of orientation, normal judgment and insight, intact recent and remote memory, normal fund of knowledge, normal abstract thinking, normal associations, and normal thought processes.  (*Id.* at 2125-26; *see also id.* at 23)  She was again described as being well groomed and "easily responsive to visual, verbal and tactile stimulation[.]"  (*Id.* at 2125)

---

reviewing court has a responsibility to uphold a decision "if the agency's path may reasonably be discerned"); *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that an ALJ is not required to "use particular language or adhere to a particular format in conducting h[er] analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").

- At a July 26, 2019 appointment, Favazza reported that she was "generally feeling better" though she was "having issues with mood and anxiety." (*Id.* at 2132)  Again though, her mood was described as normal and appropriate to the situation.  (*Id*. at 2133)  She otherwise was described as being "awake and alert" with a normal level of orientation to time, place, person and situation; she also had normal judgment and insight, intact recent and remote memory, a normal fund of knowledge, normal associations, normal judgment, and normal thought processes.  (*Id.* at 2133-34)  She was also described as being well groomed and "easily responsive to visual, verbal and tactile stimulation[.]" (*Id.* at 2133; *see also id*. at 23)

- At a September 26, 2019 appointment, Favazza again reported "having issues with mood and anxiety." (*Id.* at 2147)  However, the treatment record again displays largely normal findings.  Favazza's mood was described as normal and appropriate to the situation.  (*Id.* at 2148)  She was awake and alert with a normal level of orientation, normal judgment and insight, intact recent and remote memory, normal fund of knowledge, normal associations, and normal description of thought processes.  (*Id.*)  She was described as being well groomed and "easily responsive to visual, verbal and tactile stimulation." (*Id.*; *see also id*. at 23)

- Finally, in the last few appointments leading up to the David/Lowe opinion (from November 2019 to January 2020), the treatment records reported that while Favazza sometimes stated that she was having issues with mood and anxiety, on other visits she conveyed that she was "feeling good now[,]" or "doing well[.]"  (*Id.* at 2159-73)  Favazza reported mostly "improved" or "resolved" levels of "excessive worry," "feeling tired or without energy[,]" "nervousness[,]" "poor motivation[,]" "insomnia[,]" and "difficulty with activities of daily living[.]"  (*Id.*)  And she was described as having attained her goal or almost attained her goal in the areas of improving communications, increasing positive mood and employing anxiety management strategies.  (*Id.* at 2169, 2173)[14]

The objective evidence set out above, taken together, can reasonably be read to be at odds with the conclusions set out in the David/Lowe opinion.  Take, for example, David/Lowe's

---

[14]      The ALJ's decision did not specifically cite to the treatment notes referenced in this bullet point.  The Court mentions them here simply to note that they are not dissimilar in tone or tenor to the prior Mid-Atlantic treatment notes, listed above, that *were* cited by the ALJ.

opinion's conclusion that Favazza had a "moderate severe" impairment in "[u]nderstand[ing] simple, primarily oral instructions[.]"  (*Id.* at 2175-76)  Mid-Atlantic's treatment notes repeatedly indicate that Favazza had no difficulty on that score.  Instead, Favazza consistently had normal mental functioning, including normal judgment and insight and normal thought processes.  Moreover, while the David/Lowe opinion states that Favazza had "[t]rouble concentrating" and difficulty with "fatigue[,]" (*id.* at 2175; *see also* D.I. 13 at 16), in the months leading up to the opinion, Mid-Atlantic's treatment records state that Favazza's issues were "improved" or "resolved" in the areas of "feeling tired or without energy[,]" "poor motivation[,]" and "difficulty with activities of daily living[,]" (Tr. at 2159, 2163, 2167, 2171).  And Favazza reported having little to no trouble concentrating in the weeks leading up to those various appointments.  (*Id.* at 2144, 2148, 2152, 2156, 2160, 2164, 2168)

In sum, there is substantial evidence in the record to support the ALJ's conclusion that the David/Lowe opinion was unpersuasive, because it was primarily based on Favazza's subjective complaints, and because it was inconsistent with the objective medial evidence set out in Mid-Atlantic's own treatment notes.[15]  *See Winward v. Colvin*, 71 F. Supp. 3d 424, 436-38 (D. Del. 2014) (concluding that an ALJ's decision was supported by substantial evidence, where the ALJ discounted a physician's opinion that the claimant had marked restrictions in various areas,

---

[15]      Not only was the David/Lowe opinion inconsistent with much of the objective evidence in Mid-Atlantic's own notes, it was also inconsistent with the opinion of Dr. Watson. As the Commissioner points out, (D.I. 15 at 11), in an opinion dated September 27, 2018, Dr. Watson had found Favazza to be well oriented, with no speech or language difficulties, and with cognitive abilities in the average range.  (Tr. at 1252)  Dr. Watson also found that:  (1) Favazza's ability to focus was adequate, as evidenced by Favazza's ability to remain on topic during the interview; (2) her social judgment was intact; and (3) her ability to engage in abstract thought was good.  (*Id.*)  Dr. Watson concluded that Favazza was not precluded in her ability to function in the competitive labor-market setting.  (*See id.* at 1255)

including in concentration, persistence and pace, because the physician's own treatment notes indicated that the claimant was improving with medication and counseling and did not show any reported difficulties with concentration).

In pushing back against the ALJ's conclusion regarding the David/Lowe opinion, Favazza makes two arguments.  Both are unavailing.

First, Favazza asserts that the ALJ's conclusion was wrong because the David/Lowe opinion is similar, at least in some respects, to the conclusions in the LaPorte opinion.  (D.I. 13 at 16)  And to the extent the opinions differed, Favazza asserts that the ALJ should have (but did not) determine which opinion was more persuasive on those points.  (*Id.*)  Yet as the Court concluded earlier, *see supra* at 20-24 & n.12, the LaPorte opinion itself was not in harmony with the relevant medical record (in that it was contrary to LaPorte's own treatment notes).  The Court cannot see how remand could be required due to the ALJ's failure to compare the David/Lowe opinion with the LaPorte opinion—if the LaPorte opinion itself was inconsistent with the record as a whole.

Second, Favazza argues that the ALJ wrongly emphasized the fact that the David/Lowe opinion relied, to a great degree, on Favazza's own subjective reports of limitation.  (D.I. 13 at 16-17)  However, as a factual matter, this is an accurate statement.  The David/Lowe opinion *does* couch its conclusions as being largely based on what Favazza reported to the practitioners (e.g., "*[Favazza] reports* she can only work for a few hours each day" and "[i]f [Favazza] works only a few hours per day *she reports* she is able to stay on task").  (Tr. at 2174 (emphasis added))  And as the Court has already noted above, Favazza's subjective complaints to Lowe and David often did not match up with the objective findings in Mid-Atlantic's own treatment notes.  In light of this, the ALJ did not err in rejecting the David/Lowe opinion on the ground that it rested

29

substantially on Favazza's subjective comments.  *See Hartranft*, 181 F.3d at 362 (finding that the

ALJ properly discounted the claimant's subjective reports of pain, in part because those reports

conflicted with the objective medical evidence of record, and noting that "[a]llegations of pain

and other subjective symptoms must be supported by objective medical evidence"); *see also Neff*

*v. Astrue*, 875 F. Supp. 2d 411, 420 (D. Del. 2012) (finding that the ALJ's conclusion that a

physician's opinion "was not formed on the basis of physical examinations, but stemmed from

over-reliance on [claimant's] subjective complaints" was "reasonable[,]" where there was "little

objective evidence in the medical record" to support the claimant's subjective reports of pain).

For all of the reasons set out above, the ALJ's treatment of the David/Lowe opinion

cannot be the basis for remand.

### 3.    Dr. Moore and Dr. Rafique

Favazza's final argument relates to how the ALJ addressed Dr. Moore's and Dr.

Rafique's opinions.[16]  (D.I. 13 at 17-19)  The Court here summarizes these providers'

conclusions, as well as the ALJ's assessment of those conclusions:

- <u>Dr. Moore's November 25, 2018 Opinion</u>:  Dr. Moore completed a
  Medical Source Statement of Favazza's ability to perform physical work-
  related activities.  (Tr. at 1524)  Due to pain and complications resulting
  from Favazza's fibromyalgia and intervertebral disc disorder, Dr. Moore
  opined that Favazza's pain would be exacerbated by sitting for longer than
  10-15 minutes, making Favazza "incapable" of sitting for an 8-hour
  workday.  (*Id.*)  She similarly concluded that Favazza was only capable of
  standing for 10-15 minutes at one time, again making Favazza "incapable"
  of doing so for an 8-hour workday.  (*Id.*)  As for lifting, Dr. Moore
  concluded that Favazza could frequently lift 0 pounds and occasionally lift

---

[16]    As noted above, one of Dr. Rafique's opinions—the February 18, 2019 opinion—
(Tr. at 1455-56), relied on a Functional Capacity Evaluation ("FCE") conducted by Rodriguez,
(*id.* at 1871).  Favazza did not challenge the ALJ's determination as to the Rodriguez FCE itself.
But the Court will discuss the FCE here because it is crucial to understanding Dr. Rafique's
February 18, 2019 opinion (an opinion that Favazza *does* challenge).

5 pounds due to "[w]idespread pain from fibromyalgia (knees), intervertebral disc disorder (lumbar herniated disc)[.]" (*Id.*) Dr. Moore further opined that Favazza would be incapable of an 8-hour work day, given her need to lie down to rest or elevate her feet. (*Id.*) As for Favazza's use of her hands, Dr. Moore found that in an 8-hour workday, Favazza could, with her right and left hands, "rarely" reach and finger and "occasionally" handle. (*Id.*) Dr. Moore noted that Favazza's hands and fingers were "swollen due to fibromyalgia[ and] morning stiffness" and that her "[f]ine motor/dexterity [was] limited with hands due to fibromyalgia." (*Id.* at 1524-25) Given these findings, Dr. Moore ultimately concluded that Favazza was not capable of performing sedentary work during an 8-hour workday. (*Id.* at 1525)

The ALJ determined that Dr. Moore's November 25, 2018 opinion was "not persuasive, as it is overly extreme, and is not supported by the overall medical evidence or objective findings." (*Id.* at 25) The ALJ did not further elaborate on this statement.

- Dr. Moore's September 20, 2019 Opinion: In this opinion, (*id.* at 1881), Dr. Moore concluded that Favazza could only sit for 10-15 minutes at a time due to her degenerative disc disease, hypersomnia, and fibromyalgia, (*id.* at 1882-83). As for standing, Dr. Moore concluded that Favazza was only capable of doing so for "a few hours per day (10-15 minutes at one time)" for the same reasons. (*Id.*) Given Favazza's "severe pain and fatigue[,]" Dr. Moore concluded that Favazza would need to lie down during the day. (*Id.* at 1883) She further found that Favazza could rarely (i.e., 0-30% of the time) reach up above her shoulders, reach down to waist level, reach down towards the floor, carefully handle objects, and handle with her fingers. (*Id.*) Dr. Moore also concluded that Favazza's disabilities "prevent[ed] [] her from performing certain motions such as lifting, pulling, holding objects, etc." (*Id.* at 1884) She noted that Favazza's reports of pain were "very credible[.]" (*Id.* at 1885) Given these limitations, Dr. Moore concluded that Favazza would be unable to "continue or resume work at [her] current or previous employment" as a dental hygienist and that there was no other work she could handle. (*Id.*)

The ALJ concluded that this opinion was "persuasive, to the extent it is consistent with the [ALJ's previously-stated] residual functional capacity assessment and finding the claimant can perform sedentary work" but that it was "not persuasive as to the more restrictive limitations, including that the claimant . . . can rarely reach, handle, or finger[.]" (*Id.* at 24-25) The ALJ further noted that such a conclusion was "not supported by the overall medical evidence or objective findings, including Dr. Moore's own examination of the claimant." (*Id.* at 25) In support, the ALJ cited to one treatment record of Dr.

Moore from a single visit on September 20, 2019 and to a gynecological exam that was conducted by another physician on October 9, 2019. (*Id.*) The ALJ described how these records purportedly showed how Dr. Moore's conclusions were off base (as is further discussed below). (*Id.*)

- Dr. Moore's October 29, 2019 Opinion: In this opinion, (*id.* at 1542), Dr. Moore concluded that Favazza could not "[c]omplete activities of daily living independently[,]" "[s]it or stand up to 4 hours," or "[c]limb a flight of stairs or walk 100 yards without pause" due to, *inter alia*, Favazza's fibromyalgia and lumbar herniated disc, (*id.* at 1543). As a result, Dr. Moore concluded that Favazza was unable to work, noting that Favazza "[h]as had symptoms for years[]" and that those symptoms were "not getting better with treatment[.]" (*Id.* at 1542-43)

  The ALJ found this opinion to be "persuasive, to the extent it is consistent with the [ALJ's] residual functional capacity assessment and finding the claimant can perform sedentary work" but that it was "not persuasive as to the more restrictive limitations, including that the claimant cannot sit up to 4 hours" because the conclusion was "not supported by the overall medical evidence or objective findings, including Dr. Moore's own examination of the claimant." (*Id.* at 25) In support of this conclusion, the ALJ listed the same reasons as she did for rejecting Dr. Moore's September 20, 2019 opinion. (*Id.*)

- Dr. Rafique's November 2, 2018 Opinion: Dr. Rafique completed a Medical Source Statement in which she opined that Favazza *could* perform sedentary work 8 hours a day but could only stand for 30 minutes at a time, walk without stopping for one city block, and remain at her workstation for 2-4 hours in an 8-hour workday. (*Id.* at 1516-17) She further found that Favazza could frequently handle and finger with both hands, but only occasionally (2-4 hours in an 8-hour workday) reach with either hand. (*Id.* at 1516) Dr. Rafique also concluded that Favazza could occasionally perform postural activities; specifically, she could only bend or crouch for 1-2 hours in an 8-hour day and could climb, kneel, stoop, or balance for 2-4 hours in an 8-hour workday. (*Id.* at 1517)

  The ALJ concluded that this opinion was "persuasive, to the extent it is consistent with the [ALJ's] residual functional capacity assessment and finding the claimant can perform sedentary work, which is supported by the overall medical evidence and consistent with the record as a whole." (*Id.* at 25) The ALJ did not elaborate further.

32

- <u>Dr. Rafique's February 18, 2019 Opinion</u>:  Dr. Rafique completed an amended Medical Source Statement, (*id.* at 1455), in which she now concluded that Favazza could *not* perform sedentary work for 8 hours per day, (*id.* at 1456).  She based this amended conclusion on Favazza's worsening condition and the FCE performed by Rodriguez.[17]  Specifically, Dr. Rafique found that Favazza could stand for no more than 10 minutes at one time and in an 8-hour workday and that Favazza could sit for no more than 20 minutes at one time and in an 8-hour workday.  (*Id.* at 1455)  She concluded that Favazza would not need to lie down during an 8-hour workday, but she did find that Favazza could only remain at a workstation for 20 minutes, as her "tolerance [had] worsened due to pain in [her] low back." (*Id.*)  As for Favazza's hands, Dr. Rafique opined that Favazza could "rarely" reach with her right hand and "occasionally" handle and finger with that same hand.  (*Id.*)  As for her left hand, Dr. Rafique concluded that Favazza could only occasionally reach, handle, or finger.  (*Id.*)  In an 8-hour workday, Dr. Rafique further found that Favazza could "rarely" climb steps or ladders, bend, kneel, stoop, crouch, or balance.  (*Id.* at 1456)  She concluded that "[Favazza's] condition has slowly worsened over time despite ongoing treatment[, ] medications[,] and interventions." (*Id.*)

  The ALJ concluded that Dr. Rafique's opinion was "not persuasive, as the medical evidence does not support such restrictive limitations, including the objective findings of the F[CE], which this Medical Source Statement indicates it is basing its limitations on." (*Id.* at 25)[18]  The ALJ did not further elaborate on this statement.

---

[17]    Rodriguez's FCE, dated December 12, 2018, was completed in between the time Dr. Rafique issued her first and second opinions, upon referral from Dr. Rafique.  (Tr. at 1872)

[18]    Given Dr. Rafique's reliance on Rodriguez's findings, the Court here summarizes those findings as well.  Rodriguez's FCE found that Favazza could rarely handle repeated arm motions as to her right arm and occasionally handle such motions as to her left arm.  (Tr. at 1871)  Rodriguez further concluded that Favazza could only occasionally handle repetitive use of her wrists or hands.  (*Id.*)  Meanwhile, Favazza could reach up above her shoulders with her right arm "never" and with her left arm "rarely[.]" (*Id.*)  Rodriguez also found that Favazza could conduct simple grasping and pushing/pulling with her hands but that she could not conduct fine work, high speed assembly, or low speed assembly with her hands.  (*Id.*)  She concluded that it was safe for Favazza to reach horizontally only occasionally.  (*Id.* at 1873)  Favazza could also reach overhead with her left upper extremity occasionally but was "unable to reach overhead with [right upper extremity] due to pain along bicep tendon and rotator cuff tendons." (*Id.*)

    In light of these findings, Rodriguez repeatedly concluded that Favazza was "[u]nable to work[.]" (*Id.* at 1871)  Notably, Rodriguez's conclusions and findings were based on her

33

With that summary now set out, the Court turns back to Favazza's argument.  Favazza asserts that the ALJ failed to provide a reasonable basis for rejecting the opinions of Dr. Moore and Dr. Rafique, and that the ALJ failed to acknowledge the consistency between the opinions. (D.I. 13 at 17-19)  More specifically, Favazza notes that Dr. Moore and Dr. Rafique (as well as Rodriguez) "all opined that [Favazza] has work-preclusive limitations in sitting, standing, walking, reaching, handling, fingering; and generally, remaining at the workstation and on task for an 8-hour workday."  (*Id.* at 17 n.20 (citing Tr. at 1516-17, 1524-25, 1871-73, 1881-83); *see also id.* at 13-14)  Despite this consistency, Favazza argues that the ALJ either wholly or partially rejected the opinions of Drs. Moore and Rafique with little to no analysis or explanation.  (*Id.* at 17-18)  According to Favazza, this resulted in a situation in which it was "not at all clear what evidence the ALJ relied on in reaching her conclusions and formulating her RFC finding."  (*Id.* at 18)

The Court agrees with Favazza that the ALJ's treatment of these medical opinions is grounds for remand.  This is so for at least two reasons.

The first reason relates to the portion of the ALJ's RFC conclusion stating that Favazza could perform "*frequent* fingering, handling, and reaching[.]"  (Tr. at 18 (emphasis added))  As described above, Drs. Moore and Rafique (and Rodriguez, on which Dr. Rafique's latest opinion

---

objective observations after examining Favazza's physical capabilities.  These findings indicated that Favazza had some abnormal results as to her shoulders and wrists, including at least in "[upper extremity ("UE")] Strength" and "UE [range of motion]."  (*Id.* at 1872)  Rodriguez also stated that Favazza's "movement patterns were consistently abnormal during the [assessment,] specifically in cervical spine, lumbar pain, right shoulder, [and] right knee[,] indicating that pain, [range of motion] and strength deficits are impacting normal joint movement and function."  (*Id.* at 1873)

relied), all found—in four different medical opinions provided between November 2018 and October 2019—that Favazza could only *occasionally* or *rarely* finger, handle, or reach.  (*Id.* at 1455, 1524, 1871, 1883)  The only provider opinion to state that Favazza could "frequently" perform some such actions was Dr. Rafique's November 2, 2018 opinion.  (*Id.* at 1516)  But Dr. Rafique later provided a second opinion, in which she specifically noted that Favazza's condition had worsened and that Favazza could no longer frequently perform these tasks.  (*Id.* at 1455)[19]

Whether Favazza could *frequently* finger, handle and reach in the relevant time period— as opposed to being *occasionally* or *rarely* able to do so—is particularly important to this appeal. That is because, as Favazza notes, the answer to this question could be determinative as to whether Favazza is disabled or not.  (D.I. 13 at 15)  The VE testified that if Favazza's manipulative limitations changed to "occasional[,]" then she could not perform any sedentary

---

[19]     In addition to the four medical opinions concluding that Favazza could only occasionally or rarely finger, handle or reach, Favazza's medical records (including both subjective and objective reports) also support this finding.  (*See e.g.*, Tr. at 373 (July 2017 report of office visit noting "normal range of motion" as to shoulders, elbows, and wrists but "pain with pressure on all the joint lines" and "soft tissue tenderness"); *id.* at 400 (September 2017 report noting "examination of bilateral upper and lower extremities revealed multiple tender points all over the body"); *id.* at 558-59 (December 2017 visit summary noting that Favazza was reporting pain in her shoulders and hands, with diagnoses of "[l]ow back pain[,]" "[p]ain in unspecified shoulder[,]" and "[c]hronic pain syndrome" due to fibromyalgia); *id.* at 1192-1239 (reports from visits to Dr. Rafique from February 2018 through August 2018, in which Favazza reported pain in the hands and/or shoulders); *id.* at 1266 (report from October 2018 visit to Dr. Rafique, noting "[t]enderness on palpation on left shoulder, elbow, wrist joints as well as upper trapezius and muscular region"); *id.* at 1440, 1482, 1907, 1913, 2204 (visits to Dr. Rafique from February 2019 through May 2019, in which Favazza reported pain in the hands and/or shoulders and/or wrists); *id.* at 1919-22 (June 2019 summary of visit with Dr. Rafique, in which subjective reports of pain in the right shoulder, both wrists, and lower back were noted, and upon physical exam, "pain with [internal/external rotation]" of right shoulder and pain upon full range of motion test of right shoulder); *id.* at 1928-81, 2081 (visits to Dr. Rafique from August 2019 through January 2020, in which Favazza reported pain in the hands and/or shoulders and/or wrists))

work.  (Tr. at 83; *see also id*. at 27 (ALJ concluding that Favazza was not disabled because she could perform three sedentary occupations))

So then the question becomes, was there substantial evidence in the record to support the ALJ's contrary conclusion that Favazza could *frequently* finger, handle and reach?  The answer is "no."

In her decision, the ALJ cited to nothing in the medical record that explicitly supports her conclusion here.  Indeed, the ALJ's decision only appears to mention Favazza's fingering, handling and reaching capacity in one place.  This comes on page 16 of the decision, where the ALJ notes Dr. Moore's conclusion that Favazza "can rarely reach, handle or finger" and then states that this finding is "not supported by the overall medical evidence or objective findings, including Dr. Moore's own examination of the claimant."  (*Id*. at 25)  Then, in explaining why this was so, the ALJ makes reference to Favazza's September 20, 2019 meeting with Dr. Moore.  (*Id*.)  The ALJ wrote that at that visit, Favazza "ha[d] no abnormalities noted on physical exam, she has a normal range of her extremities, with full range of motion (FROM), and a normal neurologic exam, with no gross motor deficit[.]"  (*Id*. (citing *id*. at 1859-60))[20]

---

[20]     After summarizing this September 2019 visit with Dr. Moore, the ALJ cited to notes from one additional doctor's visit:  an October 9, 2019 visit that Favazza had with her gynecologist, Dr. Alexander Kirifides.  (Tr. at 25)  The ALJ stated that during this visit, Dr. Kirifides wrote, *inter alia*, that Favazza denied numbness, tingling and joint pain, and otherwise reported normal results.  (*Id*. (citing *id*. at 1877-78))  The Court finds the ALJ's reliance on this medical report to be unpersuasive.  It is not clear to the Court why, in a record as fulsome as this one, the ALJ called on a treatment record from a gynecologist in order to reject Dr. Moore's and Dr. Rafique's multiple opinions as to Favazza's ability to use her fingers, hands and arms.  The purpose of Favazza's visit with Dr. Kirifides was simply so that Favazza could receive her annual gynecological exam.  (*Id*. at 1875)  It is hard to see why during that visit, Favazza would have been expected to discuss in any detail ailments that have essentially nothing to do with gynecological issues, such as hand and arm mobility.

Now, it is true that in the September 20, 2019 treatment notes, Dr. Moore did make the following notation: "Extremities: FROM, no cyanosis, clubbing or edema[.]" (*Id*. at 1860 (emphasis omitted)) But the ALJ provided no explanation or support for her conclusion that this one reference to a normal "FROM" test necessarily means that Favazza could *frequently* finger, handle, or reach. Such support was needed here, particularly because Dr. Moore herself (as well as two other medical providers) had repeatedly concluded that Favazza could *not* do so.[21]

For these reasons, the Court concludes that the ALJ's RFC finding—as it relates to Favazza's ability to finger, handle and reach—is not supported by substantial evidence. *See Nazario v. Comm'r Soc. Sec*, 794 F. App'x 204, 209-10 (3d Cir. 2019) (noting that "an ALJ may not make speculative inferences from medical records and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion") (internal quotation marks and citation

---

[21]     At the beginning of her step four analysis, the ALJ also noted that Favazza had some normal findings regarding her extremities in the summer of 2017. Specifically, the ALJ there cited to a June 2, 2017 electromyography ("EMG") of Favazza's bilateral upper extremities. (Tr. at 20-21 (citing *id*. at 833)) The ALJ noted that in this exam, Favazza had "reduced pinprick sensation in the right index finger, but her neurological exam is otherwise normal, with 5/5 motor strength in the bilateral upper extremities[.]" (*Id*. at 21 (citing *id*. at 760-61))

It is unclear whether the ALJ relied on this June 2017 report to reach her decision that Favazza could frequently finger, handle, or reach. But if the ALJ had done so, the Court would find such reliance to be unpersuasive. These June 2017 findings are dated well over one year before the earliest relevant medical opinion, and roughly two years earlier than the other relevant medical opinions. Moreover, as Dr. Rafique specifically noted in her February 18, 2019 opinion, Favazza's condition had worsened between 2017 and 2019. (*Id*. at 1456) And Favazza was not even diagnosed with fibromyalgia until July 2017. (*Id*. at 372-73) All of this indicates that any findings on a June 2017 EMG could not amount to substantial evidence of Favazza's ability to frequently finger, handle or reach as of the date of the ALJ's May 2020 decision. *See Suarez v. Comm'r of Soc. Sec*., No. 09-CV-338 (SLT), 2010 WL 3322536, at *8 (E.D.N.Y. Aug. 20, 2010).

omitted); *Moffatt v. Astrue*, Civil Action No. 10-226, 2010 WL 3896444, at *6 (W.D. Pa. Sept. 30, 2010) (noting that an ALJ "lacks the expertise to ascertain a claimant's [RFC] from raw medical data" and that the ALJ violated that precept by rejecting the opinions of two treating physicians "based solely on his own interpretation of the relevant treatment notes and without reference to countervailing medical evidence").

There is also a second reason why the Court must remand as to the ALJ's RFC conclusion. This relates to other aspects of the ALJ's finding that Favazza could perform sedentary work.

Sedentary work is defined as follows:

> [W]ork involv[ing] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day. *See Melchionna v. Comm'r Soc. Sec.*, No. 21-1860, 2022 WL 822127, at *2 (3d Cir. 2022). Again, Dr. Moore, Dr. Rafique and Rodriguez all concluded that Favazza had various work preclusive limitations in sitting, lifting, carrying, standing and walking, and that Favazza was incapable of remaining at her workstation for an 8-hour workday. For instance, Drs. Moore and Rafique both opined that Favazza could sit for no longer than 15-20 minutes in an 8-hour workday due to her fibromyalgia and back pain/disc disease. (Tr. at 1455, 1524,

1882)[22]  And Dr. Moore concluded that Favazza could not make it through an 8-hour workday

without lying down during the day.  (*Id.* at 1524, 1882).  Based on these limitations and others,

Dr. Moore, Dr. Rafique and Rodriguez concluded that Favazza would be incapable of sedentary

work.  (*Id.* at 1456, 1525, 1871)[23]  Such conclusions are also supported by the subjective and

objective evidence in the record.[24]

Despite these opinions, the ALJ concluded to the contrary that Favazza could perform

sedentary work.   But the ALJ provided sparse reasoning in support.   The only aspect of

Favazza's physicians' opinions that the ALJ addressed head on was Dr. Moore's opinion, in

which Dr. Moore had concluded, *inter alia*, that Favazza could not sit for more than 4 hours in a

typical work day.  (*Id*. at 25)  In explaining why she disagreed with this conclusion, the ALJ

---

[22]     Rodriguez similarly found that Favazza would only be able to sit on an "occasional" basis (i.e., 7%-33% of the workday), which would amount, at most, to approximately two hours.  (Tr. at 1871)

[23]     During the administrative hearing, the VE also confirmed that someone with these limitations could not perform sedentary work.  (Tr. at 81-82)

[24]     (*See, e.g.*, Tr. at 558 (record from December 2017 visit with Dr. Rafique, in which "Pain Location(s)" are identified as "B/L Shoulders[,]" "B/L Hands[,]" "Low Back[,]" and "Neck[,]" and aggravating factors for that pain are listed as "Standing, Walking, Sitting, Driving, rest and Cold"); *id.* at 1207 (record from April 2018 visit with Dr. Rafique, in which "Pain Location(s)" are identified as "Neck, R Shoulder, [and] R hip[,]" with aggravating factors of "standing, walking, sitting, driving, touch and cold"); *id.* at 1213 (same in May 2018); *id.* at 1219 (same in June 2018); *id.* at 1226 (same in July 2018); *id.* at 1257 (record from September 2018 visit with Dr. Rafique, in which "Pain Location(s)" are identified as "Neck, R shoulder, B/L wrists, Lower back, B/L hips, B/L thighs, B/L shins, B/L heels, [and] R ankle[,]" with "Straining, standing, sitting, driving, touch and cold" as aggravating factors); *id.* at 1440 (largely the same in February 2019); *id.* at 1785 (December 2018 visit with Dr. Moore, in which Favazza's physical exam resulted in notes that she had "[d]ifficulty walking" and that her "[m]uscles [were] tender to touch"); *id.* at 1945 (record of September 2019 visit with Dr. Rafique, in which the record reports tenderness to palpation over the upper trapezius, middle trapezius, lumbar region, lateral thigh tender points, and tenderness to lumbar facets))

again cited to Dr. Moore's September 20, 2019 treatment record, noting that therein, Favazza was said to have had "no abnormalities on physical exam" and had a "normal exam of her extremities[.]" (*Id.* (citing *id.* at 1859-60))

Yet the ALJ provided no further explanation as to why an exam finding like this one would mean that Favazza could sit for more than 4 hours a day, or that she was capable of sedentary work.[25] (*Cf. id.* at 1860 (Dr. Moore, in this same treatment record, noting that Favazza's fibromyalgia had "deteriorated")) It is thus unclear to the Court why the ALJ chose to disregard the numerous and consistent medical opinions that were to the contrary. Therefore, for this additional reason, the Court concludes that the ALJ's RFC determination at step four, as well as her related decision of no disability at step five, must be overturned. *See Fuoti v. Saul*, No. 3:18cv1119, 2020 WL 1244371, at *4 (M.D. Pa. Mar. 16, 2020) ("Considering the ALJ relied on medical evidence that neither discusses the plaintiff's physical limitations nor clearly contradicts

---

[25]    The Court notes that the record includes the February 18, 2019 opinion of a state agency medical consultant. (Tr. at 102-09; *see also id.* at 24 (ALJ noting that the state agency medical consultant had, upon reconsideration, concluded that Favazza could perform sedentary work)) In that opinion, the consultant concluded, *inter alia*, that Favazza could sit with normal breaks for "[a]bout 6 hours in an 8[-]hour workday" and that Favazza was capable of sedentary work. (*Id.* at 105-06)

To the extent that the ALJ relied on this state agency opinion, it is unclear to the Court *why* she did so—i.e., why the content of that opinion was persuasive enough to support the ALJ's "sedentary work" conclusion, especially when four other opinions from three different treatment providers all stated that Favazza was incapable of performing any employment due to various limitations. When the ALJ mentioned this state agency opinion, she noted only that she found it "persuasive, insofar as it is consistent with the above residual functional capacity assessment, as it is supported by the overall medical evidence." (*Id.* at 24) But the ALJ never discussed in any real detail the consistency or supportability of the conclusions in that opinion, as compared to the overall medical record—the type of analysis required by Section 404.1520c. In the absence of such analysis, the Court cannot confirm that the ALJ's conclusion in this regard was supported by substantial evidence.

the opinion of the plaintiff's treating physician, we must conclude that it is his 'lay opinion' and interpretation of the plaintiff's medical records.").

The Court will remand so that the ALJ can re-assess Favazza's RFC in light of the issues discussed in Section III.B.3 of this opinion, and re-evaluate Favazza at steps four and five while addressing those issues in detail.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, Favazza's motion for summary judgment is GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's cross-motion for summary judgment is GRANTED-IN-PART and DENIED-IN-PART.  This case is REMANDED for further proceedings consistent with this opinion.  An appropriate Order will issue.